POLLITZ *v.* MICHIGAN RAILROAD COMMISSION.

1. RAILROADS — MICHIGAN RAILROAD COMMISSION — POWERS — JU-
DICIAL QUESTIONS.

   The statute (Act No. 144, Pub. Acts 1909, as amended by
   Act No. 259, Pub. Acts 1915, 2 Comp. Laws 1915, § 8161
   *et seq.*) does not commit to the Michigan railroad com-
   mission for decision any questions which may arise be-
   tween an applying corporation and its stockholders, or
   between the corporation and the State, and the jurisdic-
   tion of the commission may not be extended merely by
   raising before it questions which are judicial in character
   and properly for the courts to determine.[1]

2. SAME—CERTIORARI—QUESTIONS REVIEWABLE.

   Upon certiorari to review an order of the Michigan railroad
   commission, the Supreme Court will not review an opinion
   of the commission based upon evidence; neither will it
   review any matter not committed to the commission for
   decision and not decided by it.

3. SAME—REMEDY OF STOCKHOLDERS—EQUITY.

   A suit in equity to question the power of a railroad corpo-
   ration to guarantee the bonds of another railroad of
   which it is part owner is the proper remedy of objecting
   stockholders of the corporation so guaranteeing said bonds,
   rather than certiorari to review the action of the Michi-
   gan railroad commission authorizing said guaranty.[2]

4. SAME—ULTRA VIRES—QUESTIONS REVIEWABLE.

   Where the evidence is insufficient for the Supreme Court
   to determine that the commission should have found that
   the guaranteeing of said bonds was *ultra vires* (admitting
   that the commission had power to decide said question),
   its order authorizing such guaranty will, upon certiorari
   to review said order, be affirmed, since the question of
   *ultra vires* can be determined upon a trial of the issue.
   BIRD, C. J., and KUHN, J., dissenting.

Certiorari by James Pollitz and another to review
an order of the Michigan railroad commission author-
izing the New York Central Railroad Company and

[1]See notes in 45 L. R. A. (N. S.) 629; 47 L. R. A. (N. S.) 1167.
[2]See note in L. R. A. 1918D, 175.

the Michigan Central Railroad Company and others to guarantee the payment of bonds. Submitted June 28, 1917. (Docket No. 84.) Writ dismissed May 29, 1919.

*Orla B. Taylor* (*Elijah N. Zoline*, of counsel), for appellants.

*Alexander J. Groesbeck*, Attorney General (*Frank E. Robson* and *Robert J. Cary*, of counsel), for appellee.

BIRD, C. J. (*dissenting*). This proceeding is certiorari to the Michigan railroad commission to review its order authorizing the New York Central Railroad Company and the Michigan Central Railroad Company to join with the Canada Southern Railway Company and the Canadian Pacific Railway Company in guaranteeing $2,000,000 par value of the bonds of the Toronto, Hamilton & Buffalo Railway Company.

The Toronto, Hamilton & Buffalo Railway Company is a Canadian railway owning about 120 miles of railway, extending westerly from Hamilton around the end of Lake Ontario to Waterford and Welland, connecting at those points with the Michigan Central-Canada Southern lines, with the Canadian Pacific at Hamilton, and with the New York Central at Niagara Falls. Its authorized capital stock is $5,500,000, divided into 55,000 shares, of which 45,125 shares have been issued, and are owned as follows:

New York Central Railroad Co.................16,766
Michigan Central      "      "  .............. 9,842
Canada Southern Railway Co...................,.. 6,271
Canadian Pacific      "      "  ...................12,246

In August, 1916, the Toronto, Hamilton & Buffalo Railway Company executed a mortgage on all of its property, securing $10,000,000 of 4½% bonds, $2,-000,000 of which have been issued and denominated

"Series A." This series was purchased by the stockholding railways at 90% of its par value, in the following amounts:

| | | |
|---|---|---|
| New York Central Railroad Co. | $500,000 |
| Michigan Central         "      " | 250,000 |
| Canada Southern Railway Co. | 250,000 |
| Canadian Pacific       " .   " | 1,000,000 |

The owners of these bonds, being desirous of selling them to the investing public, concluded that the price obtainable therefor would be materially enhanced if the owning companies jointly and severally guaranteed the principal and interest. In view of this they entered into such agreement. In pursuance of this plan the New York Central and the Michigan Central Railroad companies each filed its petition with the Michigan railroad commission, praying for its approval. A hearing followed and the prayer of the petition was granted on September 27, 1916. On November 8th following, the petitioners as stockholders of the New York Central and Michigan Central railroad companies filed their objections to the order and petitioned the commission for a rehearing, the principal objection being that the commission had exceeded its authority in authorizing these railways to guarantee the bonds of another railway company. After a legal argument of the questions involved the commission decided it had the power to grant the order theretofore made and the rehearing was denied. This court then ordered, upon application of petitioners, the issuance of a writ of certiorari to review the proceedings.

1. Before proceeding to consider the questions raised by plaintiffs, attention should be given to the claim of the railways on behalf of the commission, that plaintiffs are not "persons aggrieved" within the meaning of the statute and, therefore, the proceeding should be dismissed. The statute referred to is Act No. 144, Pub. Acts 1909, as amended by Act No. 259,

Pub. Acts 1915 (2 Comp. Laws 1915, § 8161 *et seq.*). This is the act which confers jurisdiction upon the railroad commission to act in such matters. It provides for a review of the final orders of the commission in the following words:

"The Supreme Court, upon petition of any person aggrieved, may review by certiorari any final order of determination of the commission."

It is said by counsel for defendant that the corporate affairs of these railway companies are managed and directed by their directors and officers, and that plaintiffs, as mere stockholders, have no right to meddle therewith. Plaintiffs concede this to be the general rule if the subject-matter of the controversy be one in which the officers and directors of the corporation are acting within their authority and discretion and in good faith, but they assert and base their whole contention upon the legal proposition that the Michigan railroad commission has made an order in excess of its authority, and that in authorizing these two railroads to guarantee the obligations of another railway it has authorized an act in excess of the franchise rights of the railways. In short, that the commission has authorized the railways to do an act which is *ultra vires*, and they insist that when this state of affairs exists a stockholder has a right to intervene and prevent it.

It is said in Ruling Case Law that:

"If the officers of a corporation wrongfully deal with its property, to the injury of the stockholders, the latter may maintain a bill against the corporation and its officers for relief against such misappropriation. * * * A minority of the stockholders may maintain a suit in equity against the directors, against the corporation and against all others, whether the individuals or corporations, assisting them or confederating with them, to restrain such corporation and directors thereof from doing acts which amount to

violation of charters, or to prevent any misapplication of their capital or profits, which might result in lessening dividends of stockholders, or value of their shares, if acts intended to be done create what in the law is denominated a 'breach of trust.' "    7 R. C. L. p. 316, and cases cited.

See, also, *Miner* v. *Ice Co.*, 93 Mich. 97 (17 L. R. A. 412) ; *Flynn* v. *National Bank*, 122 Mich. 642; *Torrey* v. *Cement Co.*, 150 Mich. 86; *Robinson* v. *De Luxe Motor Car Co.*, 170 Mich. 163.

"And it has been held that where a corporation is doing acts not in its power, a single stockholder may maintain a suit to stop or prevent it."    *Byrne* v. *Manufacturing Co.*, 65 Conn. 336 (31 Atl. 833, 28 L. R. A. 304) ; *Smith* v. *Stage Co.*, 18 Abb. Pr. (N. Y.) 419; *Leslie* v. *Lorillard*, 110 N. Y. 519 (18 N. E. 363, 1 L. R. A. 456).

"And it makes no difference that the acts complained of are beneficial to him or the corporation, as he has a right to stand on his contract."    *Central R. Co.* v. *Collins*, 40 Ga. 582.

It is quite evident under the practice above indicated that were plaintiffs knocking at the door of an equity court with the same complaint that is here made, they would be admitted. This being so, we think it follows that their interest in the controversy, as stockholders, is sufficient to enable them to intervene in a special proceeding like the present one to prevent the consummation of illegal acts upon the part of these corporations, and if met with an adverse verdict, to appeal therefrom. See *People, ex rel. New York Edison Co.*, v. *Willcox*, 207 N. Y. 86 (100 N. E. 705, 45 L. R. A. [N. S.] 629).

The provision of the statute authorizing a review of the orders of the commissions is very broad. It gives the right to "any person" who is aggrieved to have a review. If counsel are right in their contention no one would be entitled to a review unless he

were a party. Had the legislature intended to restrict the right to parties, it would have doubtless provided that "any party" aggrieved instead of "any person" aggrieved might review the proceedings. See 1 Words & Phrases, p. 276.

We are of the opinion that the interest of these plaintiffs is sufficient to make them "aggrieved persons" within the meaning of the statute, authorizing a review of the final orders of the commission. Counsels' objection in this regard will be overruled.

2. Has a Michigan railway corporation the power to guarantee the obligations of another railway company?

It is the contention of plaintiffs that a railway corporation has no such power unless expressly granted by the legislature, and that the legislature in this State has not done so. The question appears to be one that is settled by authority. It is said in Cyc.:

"As a general rule a railroad company, like other private corporations other than surety or guaranty companies, has no power to enter into any contract or indorsement by which it becomes a guarantor or surety, or otherwise lends its credit to another person or company, even though it may derive some indirect benefit from the guaranty, except, in so far as it is expressly authorized to do so by its charter or other statute, and except where the power to do so is implied from the company's general powers, as being necessary and proper to enable it to accomplish the objects for which it was created, and in the conduct of its business, and where such a guaranty or a contract to give one, is for an unauthorized purpose, it has been held that it is strictly *ultra vires,* unlawful and void and incapable of being made good by ratification or estoppel." 33 Cyc. p. 455.

In Ruling Case Law, it is said:

"A railroad corporation, unless authorized by its act of incorporation or by other statutes to do so, has no power to guarantee the bonds of another corpora-

tion; and such a guaranty, or any contract to give one, if not authorized by statute, is beyond the scope of powers of the corporation, and incapable of being made good by ratification or estoppel. Accordingly though a railway company may have implied power to establish elevators to further its business, it has no power to guarantee the payment of dividends to the subscribers of stock in an elevator corporation." 7 R. C. L. p. 605.

In Cook on Corporations, it is said:

"One of the most important and yet difficult branches of railroad corporation law is the question whether one railroad corporation may guarantee the bonds or dividends of another railroad corporation. The power of a railroad corporation in this respect is much more restricted than that of a trading or manufacturing corporation, because the former is a *quasi* public corporation, and its powers are strictly construed. Moreover the location of its railroad is specified in the charter, and the guaranty of the bonds or dividends on the stock of another railroad corporation is much the same as buying the stock of the latter, which is not legal, unless expressly authorized by the charter or the statutes of the State. A railroad corporation has no implied power to guarantee the bonds or dividends on the stock of another railroad corporation. * * * The power of a railroad company to consolidate with or purchase the railroad of another company, does not give power to guarantee the bonds of the latter company, without such a consolidation or purchase." 3 Cook on Corporations (7th Ed.), § 775.

These texts, which are supported by numerous cases cited, establish the general rule that one railway company may not guarantee the obligations of another railway company unless authorized to do so by the power which created it. This is the doctrine contended for by the plaintiff and is not denied by the defendant. Counsel cite several provisions from the railroad laws of this State which they argue have some bearing on the question. They follow:

"To cross, join and unite its railroads with *any other railroad* now or hereafter constructed *under any law whatever at any point on its route;* * * * and to make *all such business arrangements* as said companies may agree upon." 2 Comp. Laws 1897, § 6234, subdivision (6).

"And any company organized under this act may make any arrangement with any other railroad company, whether organized or incorporated under this act or any other act, for running its cars over the road of such other company, or for the working and operating of such other roads as said companies shall mutually agree upon; and any companies organized or incorporated under this or any other act whose lines are connected, may enter into any arrangements for their common benefits, consistent with and calculated to promote the objects for which they were created." * * * 2 Comp. Laws 1897, § 6253.

"To borrow such sums of money as may be necessary for completing, finishing, equipping or operating their road, or any part thereof, or for paying any indebtedness necessarily incurred for completing, finishing or operating their road, or any part thereof; and to issue and dispose of their bonds or obligations for any amount necessarily borrowed for such purpose, for such sums and for such rate of interest, not exceeding ten per cent., as they may deem advisable, and to mortgage their corporate property and franchises and the income thereof, or any part thereof, to secure the payment of any debt contracted or to defray any expenditure by the company for the purpose aforesaid." 2 Comp. Laws 1897, § 6263.

"It shall be lawful for any railroad company organized, or that may be organized, under the laws of this State, to sell, lease and convey its road * * * or any part or portion thereof, to any other railroad company, whether organized within or without this State; and to acquire by lease or purchase from the owner of any other railroad such road, together with the rights and franchises connected therewith, or any part or portion thereof, whether located within or without this State, * * * to acquire and use such road, rights and franchises by purchase of the stock, or otherwise, as may be agreed between the parties interested, said railroads not having the same ter-

minal points, and not being competing lines." Act No. 30, Pub. Acts 1901 (2 Comp. Laws 1915, § 8435).

Counsel have not pointed out any express provision which authorizes a Michigan railroad company to guarantee the obligations of another company, neither have they pointed out any single provision from which that power may be implied, but the argument is that the State has manifested a broad and liberal policy toward the development of railways, and that this power may be inferred from the several provisions taken together. Counsel have cited the following cases in support of their argument: *Dewey* v. *Railway Co.* (1892), 91 Mich. 351; *Lisman* v. *Trust Co.* (1914), 211 Fed. 413; *Harrison* v. *Railway Co.* (1882), 13 Fed. 522; *Tod* v. *Land Co.* (1893), 57 Fed. 47; *Central Railroad & Banking Co.* v. *Trust Co.* (1902), 114 Fed. 263; *Chicago, etc., R. Co.* v. *Howard* (1868), 7 Wall. (U. S.) 392; *Rogers L. & M. Works* v. *Railroad Ass'n* (1888), 34 Fed. 278; *Arnot* v. *Railway Co.* (1876), 67 N. Y. 315; *Marbury* v. *Land Co.* (1894), 62 Fed. 335; *Fidelity Trust Co.* v. *Louisville Gas Co.* (1904), 118 Ky. 588 (81 S. W. 927); *Ellerman* v. *Railways Co.* (1891), 49 N. J. Eq. 217 (23 Atl. 287); *Davenport* v. *Stone* (1895), 104 Mich. 521 (53 Am. St. Rep. 467); *Zabriskie* v. *Railroad Co.* (1859), 23 How. (U. S.) 381; *Green Bay, etc., R. Co.* v. *Steamboat Co.* (1882), 107 U. S. 98 (2 Sup. Ct. 221); *Pittsburgh, etc., R. Co.* v. *Bridge Co.* (1889), 131 U. S. 371 (9 Sup. Ct. 770); *Fort Worth City Co.* v. *Smith Bridge Co.* (1894), 151 U. S. 294 (14 Sup. Ct. 339); *Central Trust Co.* v. *Railway Co.* (1898), 87 Fed. 815; *Low* v. *Railroad Co.* (1877), 52 Cal. 53 (28 Am. Rep. 629); *Atchison, etc., R. Co.* v. *Fletcher* (1886), 35 Kan. 236 (10 Pac. 596); *Eastern Township Bank* v. *Railroad Co.* (1889), 40 Fed. 423.

We have examined these cases and are satisfied that they do not infringe the general rule. An analysis of them will show that wherever the liability of the

indorsing company has been upheld, the authority for the indorsement has been found, either in legislative provisions or in the fact that the indorsing company was the owner of the bonds which it had indorsed, or that the bonds were in the hands of *bona fide* holders, or for other reasons which made it an exception to the general rule.

After a careful examination of the railroad legislation of this State, we are satisfied that there is no express provision therein which will permit the Michigan Central or the New York Central railroad companies to guarantee the bonds of the Toronto, Hamilton & Buffalo Railway Company, which it does not own, nor do we think there is any statutory provision from which the implied power can be reasonably inferred.

This same question, upon application of the New York Central Railroad Company, was before the public utilities commission of the State of Ohio. The Ohio commission granted the prayer of the petition (in so far as they had the power to do so). The Supreme Court, upon appeal, held that the commission was without power under the laws of Ohio to authorize the New York Central Railroad Company to guarantee bonds of the Toronto, Hamilton & Buffalo Railway Company, which it did not own. Having arrived at the conclusion that the laws of Michigan do not authorize it, this case is a direct adjudication upon this question and we think should be followed by us. The conclusion of Mr. Justice Johnson, who considered the question, in an exhaustive and able opinion, concludes:

"We think that the applicant has the right implied from and incidental to the exercise of powers conferred by express statutory provision in Ohio, to sell bonds which it may acquire from the Hamilton company under the circumstances set out and to guarantee such bonds as part of the transaction, in order to sell them to the best advantage. But we think it

has no authority to go beyond that and guarantee bonds which it does not own." *Pollitz* v. *Public Utilities Commission,* 96 Ohio St. 49 (117 N. E. 149, L. R. A. 1918D, 166).

Our conclusion is that these railroad companies have no power to guarantee the bonds of the Toronto, Hamilton & Buffalo Railway Company, which they do not own, and that the action of the Michigan railroad commission in authorizing them to guarantee the bonds of that company was an unauthorized act upon its part.

3. Another question should be noticed in view of arguments recently advanced. The argument is made that as the commission is a trier of facts only and has no judicial power, it is of no consequence that it has assumed to pass upon legal questions which are not within its jurisdiction; that such action will neither add to nor take away any of the rights of the parties, and, therefore, the writ should be dismissed because improvidently issued. It is for precisely this reason that the defendants have invoked the remedy of certiorari which the statute gives. It is the position of petitioners that the commission had no power to authorize the interested Michigan railways to guarantee the bonds of another railroad company, especially one operating in and subject to the laws of a foreign country. It is because this order of the commission is in excess of its jurisdiction that they want the order set aside.

If the argument to which we have referred is the proper view, why should we review drain proceedings where the drain commissioner has exceeded his authority, and why should we review the void acts of a highway commissioner in laying out a highway? Why not say the acts are void and cannot affect the legal rights of the parties and refuse to entertain the writ? It may be answered that the statute provides the remedy of certiorari in drain and highway proceedings.

So it does in this proceeding and if it cannot be used where the commission has acted in excess of its statutory authority, it is extremely doubtful whether it can be made use of in reviewing legal questions. This court has said on more than one occasion that certiorari was the proper remedy to get rid of a void judgment. *Lake Shore, etc., R. Co.* v. *Hunt,* 39 Mich. 469; *Harbour* v. *Eldred,* 107 Mich. 95.

In considering the office of the writ it is said in 5 R. C. L. p. 252:

"Accordingly it has been held that the void judgment of a justice of the peace rendered after he has lost jurisdiction of the cause may be reversed by certiorari. So, too, the writ may be brought to quash an assessment made by a State board of equalization, or to review the determination of a board of police commissioners where they have acted judicially, or to review the proceedings of a court martial. It is also the proper remedy where the officials of a municipal corporation acting judicially in the enactment of an ordinance are without jurisdiction or are otherwise acting illegally."

It is true the Michigan railroad commission is not a judicial body, it is a ministerial body, but it has *quasi* judicial powers and necessarily must decide in each case whether it has jurisdiction of the subject-matter tendered. If it errs in this respect and holds that it has jurisdiction when it has none, it would seem as though there should be some method of correcting it. Upon this subject, it is said in the same work:

"When a new or summary jurisdiction is created, the proceedings so authorized, whether in a court or not, if of a judicial or *quasi* judicial character and not subject to review by writ of error or by appeal, may be removed to and reviewed by a superior court by virtue of this writ. At common law the writ was issuable before the proceedings instituted had culminated in a trial, order or judgment, and was based on the absence or the excess or *usurpation of jurisdic-*

*tion* on the part of the tribunal from which the proceedings were removed." *Id.* p. 253.

Again:

"In the absence of statutory provisions, limiting the scope of the writ of certiorari, the rule maintained by the weight of authority is that its office extends to the review of all questions of jurisdiction of power and authority of the inferior tribunal to do the action complained of, and all questions of irregularities in the proceedings, that is, of the question whether the tribunal *has kept within the boundaries prescribed by the express terms of the statute law* or well settled principles of the common law." *Id.* p. 259.

See, also, *Gregg* v. *Hatcher*, 94 Ark. 54 (125 S. W. 1007, 27 L. R. A. [N. S.] 138, 21 Ann. Cas. 982); *Wulzen* v. *Board of Supervisors*, 101 Cal. 15 (35 Pac. 353, 40 Am. St. Rep. 17); *City of Los Angeles* v. *Young*, 118 Cal. 295 (50 Pac. 534, 62 Am. St. Rep 234); *Board of Aldermen* v. *Darrow*, 13 Colo. 460 (22 Pac. 784, 16 Am. St. Rep. 215); *Kenyon* v. *Brightwell*, 120 Ga. 606 (48 S. E. 124, 1 Ann. Cas. 169); *White* v. *Wagar*, 185 Ill. 195 (57 N. E. 26, 50 L. R. A. 60); *People* v. *Superior Court of Cook County*, 234 Ill. 186 (84 N. E. 875, 14 Ann. Cas. 753); *U. S. Standard Voting Machine Co.* v. *Hobson*, 132 Iowa, 38 (109 N. W. 458, 7 L. R. A. [N. S.] 512, 119 Am. St. Rep. 539, 10 Ann. Cas. 972); *State* v. *Board of Com'rs of Hughes Co.*, 1 S. D. 292 (46 N. W. 1127, 10 L. R. A. 588); *Tomlinson* v. *Board of Equalization*, 88 Tenn. 1 (12 S. W. 414, 6 L. R. A. 207); *City of Grand Rapids* v. *Braudy*, 105 Mich. 670 (32 L. R. A. 116, 55 Am. St. Rep. 472); *LeRoy* v. *Mayor, etc., of New York*, 20 Johns. (N. Y.) 430 (11 Am. Dec. 289).

In the last named case it was said:

"The general superintending power of the court to award certiorari not only to inferior courts, but to persons invested by the legislature with power to decide on the principle or rights of the citizen, even in

cases where they are authorized by statute finally to hear and determine, has been frequently exercised, is considered as well established by the common law, and can only be taken away by express words."

If the order of the commission giving the railways the authority to guarantee the bonds of another railway company is without authority of law, then that order should be set aside. If it is not set aside the interested railways will undoubtedly proceed to act upon the void order so made by the commission, and after the guaranty is made and the bonds get into the hands of *bona fide* holders, it will lessen the value of these objections in the courts. To avoid these consequences was one of the purposes of the commission act (3 Comp. Laws 1915, § 11945 *et seq.*), namely, to prevent illegal issues of stocks and bonds before issue rather than to litigate the questions after they were issued and after they had passed into the hands of good faith holders. The order complained of should be set aside. No costs will be allowed.

KUHN, J., concurred with BIRD, C. J.

OSTRANDER, J. The Michigan railroad commission, upon the separate applications of the New York Central Railroad Company and the Michigan Central Railroad Company, made its orders, identical in substance and effect, that made upon the application of the Michigan Central Railroad Company reading as follows:

"Application having been filed on the 26th day of September, 1916, by the Michigan Central Railroad Company for authority to guarantee the bonds of the Toronto, Hamilton and Buffalo Railway Company, to the amount of $2,000,000.00, and hearing having been had thereon on the 27th day of September, 1916, and

"It satisfactorily appearing that the Toronto, Hamilton and Buffalo Railway Company is a railroad corporation organized and existing under the laws of the Dominion of Canada, owning a railroad, extending from Waterford to Hamilton, and from Hamilton to Welland, with an extension from Hamilton towards

Toronto, and an extension from Smithville to Port Maitland, all in the Province of Ontario, Canada, and connecting with the railroad owned by the Canada Southern Railway Company and operated under lease by the Michigan Central Railroad Company at Welland and Waterford, and with the Canadian Pacific Railroad at Hamilton, and that the Michigan Central Railroad Company is a railroad corporation organized and existing under the laws of the State of Michigan, owning a railroad extending from Detroit, Michigan, to Chicago, Illinois, and operating under lease the railroad of the Canada Southern Railway Company extending from Windsor to Suspension Bridge in the Province of Ontario, Canada, and

"That the capital stock of the Toronto, Hamilton and Buffalo Railway Company now issued and outstanding is 45,125 shares of the par value of $100.00 each, which is now owned in the amounts hereinafter set forth by the following railroad companies: The Michigan Central Railroad Company, 9,842 shares, the Canada Southern Railway Company, 6,271 shares, the New York Central Railroad Company, 16,766 shares, the Canadian Pacific Railway Company, 12,246 shares, and

"That under date of August 1, 1916, the Toronto, Hamilton and Buffalo Railway Company executed its consolidated mortgage, to the Guarantee Trust Company of New York, trustee, as security for its fifty-year gold bonds to be issued to an amount not exceeding $10,000,000.00, of which bonds to the amount of $2,000,000.00 designated Series A and bearing interest at the rate of 4½ per cent. per annum, have been issued and sold jointly to the Michigan Central Railroad Company, the Canada Southern Railway Company, the New York Central Railroad Company and the Canadian Pacific Railway Company, and that the proceeds of the sale of said bonds are to be or have been used to pay outstanding, unfunded indebtedness of the Toronto, Hamilton and Buffalo Railway Company, representing expenditures incurred on the capital account and for the corporate purpose of said the Toronto, Hamilton and Buffalo Railroad Company, and that the said companies so purchasing said bonds intend to sell the same at the best price which can be obtained and use the proceeds to reimburse their re-

spective treasuries for the moneys advanced by each to pay for said bonds and, that in order to secure an adequate price it will be necessary for said companies to guarantee jointly and severally the payment of the principal and interest of said bonds as they become due, and

"This commission being of the opinion that the use of the money to be acquired by said the Michigan Central Railroad Company by the sale of said bonds so guaranteed by the Michigan Central Railroad Company and the other purchasing companies, jointly and severally, is reasonably required for the purpose of said the Michigan Central Railroad Company and for the purpose of enabling it to reimburse its treasury on account of said purchase,—

"Therefore, By virtue of the authority vested in us by law, It Is Hereby Ordered:

"(1) That said the Michigan Central Railroad Company be and is hereby authorized and empowered to join with the Canada Southern Railway Company, the New York Central Railroad Company and the Canadian Pacific Railway Company, and jointly and severally guarantee the payment of the principal and interest of $2,000,000.00 of the bonds of the Toronto, Hamilton and Buffalo Railway Company, as they become due according to the terms of said bonds secured by said mortgage executed by the said the Toronto, Hamilton and Buffalo Railway Company, to said Guarantee Trust Company of New York, trustee, under date of August 1, 1916, designated as Series A, and bearing interest at the rate of 4½ per cent. per annum.

"(2) That said the Michigan Central Railroad Company make verified report to this commission of its doings under and by virtue of this order every six months from the date hereof, and until it shall have been reimbursed from the sale of said bonds so to be guaranteed for the amount originally expended by it in said joint purchase of said bonds."

This on September 27, 1916. On November 8, 1916, plaintiffs in certiorari, Pollitz and Venner, filed a petition with the commission, reciting the granting of the orders above referred to, stating that Pollitz is a stockholder in the New York Central and Venner a

stockholder in the Michigan Central Railroad Company, denying that either of said corporations has power to make the contract of guaranty referred to in the said orders of the commission, and setting up further:

"VI. That if the contention of these petitioners is sound, to-wit: that there is no statutory authority in any of the States aforesaid expressly permitting such guaranty of bonds as is involved in this matter, which they are advised is the case, then they respectfully submit that this commission ought not to place its stamp of approval on such guaranty not only because it is unauthorized, but for the reason that such approval will be used to aid the sale of said bonds to innocent investors.

"VII. These petitioners make this application in good faith for the purpose of assisting this commission to reach a rightful determination of the matters involved; of preventing said Michigan Central and New York Central Railroad Companies from placing upon the market any bonds stamped with their illegal guaranty, and of protecting the investing public against the same.

"VIII. To the end, therefore, that your petitioners may have an opportunity to be heard and that the commission may receive further proof or information which will enable it to more justly determine whether the application should be granted, a rehearing of said matter is hereby respectfully applied for."    *    *    *

The objections and contentions of the petitioners were amplified and elaborated in a paper filed December 15, 1916, and, in substance, they amount to the following:

(*a*) The Michigan Central was without authority under the laws of the State of Michigan, and the New York Central was without authority under the laws of the State of Michigan and the other States under which it is organized, to guaranty bonds of the Toronto, Hamilton & Buffalo Company.

(*b*) There is no constitutional or statutory authority in Michigan authorizing such guaranty.

(*c*) The railroad companies were not authorized to make a joint guaranty.

(*d*) As to the New York Central the action was erroneous because:

1. It is without a legal board of directors.

2. Several members of the board of directors as now constituted, own shares of stock in express and other freight and transportation companies, contrary to the statutes of Ohio.

3. The laws of the several States under which it is organized control its action in Michigan and do not authorize the proposed guaranty.

4. It has violated the Federal laws commonly known as the Sherman and Clayton acts, and has violated certain anti-trust acts of the State of Michigan.

The commission denied the rehearing and thereupon Messrs. Pollitz and Venner sued out the writ of certiorari to review the action of the Michigan railroad commission in the premises. In their petition for the writ, after averring that neither corporation has power to make the contract of guaranty proposed to be made, it is further asserted that petitioners as shareholders are subjected to grave danger of loss and damage in case of the default of the corporation issuing the said bonds, are aggrieved by the *ultra vires* acts of the petitioning corporations and by the final order of the commission.

It is obviously of the first importance to discover the nature and the extent of the powers conferred upon the Michigan railroad commission in this behalf and the force and effect of the orders which it has made. For this purpose reference must be made to Act No. 300, Public Acts of 1909 (2 Comp. Laws 1915, § 8109 *et seq.*), Act No. 144, Public Acts of 1909, and Act No. 259, Public Acts of 1915 (2 Comp. Laws 1915, § 8161 *et seq.*). In so far as the powers and duties of the commission are herein involved, they will be found defined in the last two acts mentioned. It has no judicial or legislative powers, is an administrative energy, and with reference to most matters committed to it, and as to those here involved, is a trier of facts.

See *Michigan Cent. R. Co.* v. *Railroad Commission,* 160 Mich. 355; *Detroit, etc., R. Co.* v. *Railroad Commission,* 171 Mich. 335, 346; *Grand Rapids, etc., R. Co.* v. *Railroad Commission,* 183 Mich. 383, 392. All that the railroad companies interested here could secure from it, all that it is empowered to give them, is an order authorizing what they desire to do,

"stating that in the opinion of the commission the use of the capital or property to be acquired to be secured by the issue of such stock, bonds, notes or other evidences of indebtedness, is reasonably required for the purposes of such   *   *   *   corporation."   *   *   *

It is assumed that the *opinion* is to be based upon evidence; but the opinion having been formed favorably to the applying corporation, the order, or authorization, issues as of course. The language of the statute conveys no idea of committing to the commission for decision any of the numerous questions which may arise between an applying corporation and its stockholders, or between the corporation and the State, and no argument is required to prove that the jurisdiction of the commission may not be extended merely by raising before it questions which in our scheme of government are judicial in character and properly for courts to determine. See *Chicago, etc., R. Co.* v. *Railroad Commission,* 162 Wis. 91 (155 N. W. 941) ; *People* v. *Railway Co.,* 273 Ill. 440 (113 N. E. 68) ; *People* v. *Railroad Commissioners,* 158 N. Y. 421 (53 N. E. 163). The opinion of the commission does not make valid corporate action which as to the State, or stockholders, is invalid. It conducted in this case an inquisition, in behalf of the public, upon the application of a corporation, with respect to a single subject.

What, then, is there here for this court to review? Clearly, it will not review an opinion of the commission based upon evidence. It is quite as clear, I think, that it will not review any matter not committed to the commission for decision and not decided by it.

It is provided in the act that—

"The Supreme Court upon petition of any person aggrieved may review by certiorari any final order or determination of the commission,"

—and this provision is made the ground of an argument in behalf of plaintiffs in certiorari. The statute in this respect is, in my opinion, declaratory of the law. This court is empowered by the Constitution to issue writs of certiorari and hear and determine them. There is no provision in the act for the issue of the writ of mandamus and yet it is obvious that this court may, upon proper showing, use the writ to set the commission in motion, although not to require it to reach a particular decision. Writs of certiorari do not issue as of course, nor should this statute be construed so as to require the issue of the writ except in cases in which, the statute aside, it is considered by the court to be an appropriate remedy. Plaintiffs in certiorari are not parties to the inquisition which was conducted by the commission. That they would be admitted, in a court of equity, in a suit against the corporation, to question its power to guarantee the bonds referred to in the order of the commission, is not a fact supporting an argument in favor of their right to raise the question in this court in this proceeding. Quite the contrary. They have an adequate remedy, and no opinion of the commission and no order which this court may properly make in the premises can be urged for or against their right to pursue it in a court having jurisdiction.

I have assumed, without, however, considering or deciding, that the application of the railroads to the commission presented, within the terms of the act, a case for their opinion.

In my opinion, the writ was improvidently granted and the proceeding should therefore be dismissed, with costs against plaintiffs in certiorari.

Assuming that the commission had power to decide (I have pointed out that it did not decide) whether the proposed action of the petitioning railroads is *ultra vires*, or, as seems to be suggested, that, if it has not this power, still it ought to refuse to sanction the proposed action because such action would be *ultra vires*, upon what evidence is this court to determine that the commission, upon the application of plaintiffs in certiorari, ought to have granted a rehearing and upon the rehearing ought to have decided that the proposed action is unlawful? No testimony addressed to this issue was offered. Such evidence as the record affords is to be found in the petitions of the railroads and in the statements of their counsel addressed to the commission at the hearing. What the commission found is stated, so far as the commission regarded it as necessary to do so, in the recitals found in its order above set out. In explanation and amplification of the facts there recited, the pertinent statements of counsel for the railroads are here given:

"The Toronto, Hamilton and Buffalo is a Canadian company, operating a line between Buffalo and Hamilton, with branches that touch upon the Michigan Central, and another branch which works off towards Buffalo, so that they operate as a connecting line between the Canadian Pacific and the New York Central and Michigan Central lines, and results in a very profitable and desirable—I won't say profitable, because it is only recently the road has shown any profits, but it is a desirable connection both for freight and passengers for Canadian connection passing by way of Toronto and then working down to the north and northwest. The entire stock of the company, which is four million and a half in round numbers, is owned by the Michigan Central, the Canada Southern, New York Central and Canadian Pacific. Their shares are not equal, that is, they are not equal holdings. The Michigan Central and Canada Southern together own about fifteen thousand shares; the New York Central sixteen thousand, the Canadian Pacific twelve thou-

sand. Now, under previous arrangements, which have been in existence for a good many years, the railroads in interest have furnished money necessary to keep the company going, to make its proper capital investments by way of investments in the road and all that sort of thing, and have stood as sponsors and guardians for various obligations they have had to incur to make these investments from time to time. Now there is a mortgage upon the Toronto, Hamilton and Buffalo at present of $3,280,000. This mortgage, the present mortgage,—consolidated mortgage, authorizes the total issue of ten million dollars, out of which it is proposed to set aside sufficient to refund the first mortgage outstanding; and machinery for that refunding, either by purchase or substitution, etc., is set out to greater or less extent in the mortgage itself. Then it proposes next following that to issue two million of bonds. That two million to take care of present floating indebtedness which amounts, as shown by the petition, in round numbers—there are notes outstanding alone of $1,300,000—by reference to the mortgage you will see there are other obligations, the obligations amounting all told to something like $1,600,000 in round numbers, then to use the balance of the two million dollars for further improvements upon the road. Then, after that, the balance of it is to be issued for such future uses as may be desired. At the present time it is only sought, in this particular application, to issue two million dollars for the purpose of taking care of floating and outstanding indebtedness.

"Now the Toronto, Hamilton and Buffalo itself will be a very difficult property, in the present financial conditions, to float those at any fair prices and so the bonds have been taken in equal proportions by the four stock owners of the road, the Canadian Pacific one-fourth, New York Central one-fourth, Michigan Central one-fourth and Canada Southern one-fourth. Of course the Canada Southern, that is taken care of by the Michigan Central which is lessee and large owner of stock of the Canada Southern. Those have been taken over at ninety, as between the Toronto, Hamilton and Buffalo and the paying companies. Now it is proposed, in order to put those out upon the market and realize the money to pay themselves for

this purchase and this investment, each of the companies desire to join and all agree to join in a joint and several guarantee of the bonds so that they may be put out and sold upon the market at sufficient to realize and refund this ninety per cent. Now that, in brief, is the situation.  *   *   *

"*Chairman Hemans:* It isn't any increase in the debt of any of the parties, either the guarantors or the subsidiary companies?

"*Mr. Robson:* No, simply a shifting of the present form of indebtedness in its ultimate result.

"*Chairman Hemans:* Unless in the discount of the bonds.

"*Mr. Robson:* To that extent, of course, and that is a question of financial markets, just what you can borrow money for of course.  *   *   *

"Up to the last year or two as a matter of fact, the Toronto, Hamilton and Buffalo has a deficit; I couldn't tell you in its actual operation. It has taken care of its current obligations, but in its operations, one end or another has been a deficit; but I can't say accurately as to just the period it has commenced to earn money and show a surplus. The statement here shows at present they have a small surplus and that is an accumulation in all, in a rough way I should say, probably in the last three or four years has it been able to show any prospects for the future. The prospects of course are fairly good, depends upon what the business and relations between the two countries are, but the statement here shown that it has a profit and loss of a million and a half."

Analyzed, the facts produced show, in substance and effect, that all of the issued stock of the Toronto, Hamilton & Buffalo, the Canadian railway, is owned by the Michigan Central, Canada Southern, New York Central and Canadian Pacific railroads—not jointly, not in equal amounts. Independent of the ownership of the stock, each of these railroads has an interest in the continued operation of the said Canadian railway. It is a valuable connection for each of the interested roads. It may be assumed that the value of the association is the base upon which the financial

interest is rested. Whatever affects the integrity and prosperity of the Canadian railroad affects, alike, each of the stockholding railroads. Measured in money invested, their interests are unequal; in every other sense their interest in maintaining the road, its integrity and prosperity, is mutual. To the end, the mutually desirable end, to which the whole arrangement is projected, each of the stockholding railroads has advanced money—not in equal amounts, not represented by a joint account, but to the extent evidenced by the bonds of the Canadian road which they severally hold. That road cannot be divided up; it is an entity. Consequences of default in the payment of principal or interest of its bonded debt cannot be wholly apportioned between the interested companies by the stock and the bonds held by each. There can be no piecemeal bankruptcy of the road, and the default of the road issuing the bonds and the default of the guarantor of the bonds will affect in exactly the same way the entire interest of each interested company. Under the circumstances related, in order to make a market for the bonds, to secure proceeds for refunding the money already advanced and for financing the road generally, the interested companies ask the commission to sanction the guaranty of all the bonds by each of them. The bare recital of the facts disclosed by the record suggests that there may be, must be, other facts, circumstances, conditions, affecting the question of *ultra vires*, which can be produced upon a trial of the issue. And the facts disclosed do not necessarily and inevitably lead to the conclusion that the proposed action is unlawful. Therefore, in any view of the matter, the court should refuse to disturb the order of the commission.

MOORE, STEERE, BROOKE, and STONE, JJ., concurred with OSTRANDER, J. FELLOWS, J., did not sit.